UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 3:11-CR-134 |
| | ) | (Phillips) |
| QUINTON LEE BINFORD, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER

**I. Introduction**

On July 20, 2012, the Honorable H. Bruce Guyton, United States Magistrate Judge, filed a Report and Recommendation ("R&R") [Doc. 36] in which he recommended that the Defendant's Motion to Suppress Physical Evidence [Doc. 25] be **DENIED**. First, Judge Guyton recommends that the Court find the initial seizure of the Defendant to have been a legitimate exercise of the officer's safety prerogative. Second, Judge Guyton recommends that the Court find that, after lawful seizure, the Defendant gave consent, free of coercion, to search his backpack. If the Court finds that the initial seizure was lawful, and the subsequent search consensual, the weapon therein discovered should not be suppressed. However, if the initial seizure was unlawful, then any subsequent evidentiary discovery becomes fatally contaminated and must be discarded as fruit from a poisonous tree.

Before the Court's consideration is Defendant's timely objections to the R&R [Doc. 37] and the Government's timely response [Doc. 39]. As required by 28 U.S.C. § 636(b)(1), the court has undertaken a *de novo* review of those portions of the R&R to which the Defendant objects.

For the following reasons, the R&R [Doc. 36] is **ACCEPTED IN WHOLE.** Accordingly, for the reasons that will follow Defendant's Motion to Suppress Physical Evidence [Doc. 25] will be **DENIED**.

**II. Statement of Facts**

The Court accepts the following facts as stated by the Magistrate Judge Guyton:

The Government's first witness was Sergeant Mike Newman ("Newman"), an officer with the Loudon City Police Department ("LCPD"). Newman testified that he had been a LCPD Officer for eighteen years and that his job title is sergeant.

Newman testified that on October 8, 2011, he was working the evening shift. He received a dispatch call from 503 Ferry Street, in Loudon, stating that a man had threatened another man with a gun. Newman went to the scene, spoke with the victim, and received a description of the man who he alleged had threatened him with a gun. The victim said that when he called 911, the perpetrator left.

The victim described the perpetrator as a black male, 6'1"-6'2", wearing a white t-shirt and khaki pants, carrying a black and white backpack. The victim told Newman that the suspect went by the name "Q".

Newman testified that he then drove around the area and ended up at the public park, commonly called "Jiffy Park." This was four blocks from the victim's house. Newman said he was at the park within fifteen minutes of getting the initial dispatch call. When Newman drove into the park, he saw Binford, matching the description given by the victim. Moreover, Binford was the only black male in the park. Upon making contact with Binford, Newman placed him in handcuffs for officer safety, due to the report that Binford had a gun.

Newman then explained to Binford that Newman was investigating an alleged threat with a gun. According to Newman, Binford denied the allegation and asserted that the police were

just harassing him. At about that time, LCPD Officer Martin Ward ("Ward"), arrived on scene to back up Newman.

Newman patted down Binford. No guns were found on Binford's person. Binford then claimed ownership of his black and white backpack. Newman testified that he asked Binford for consent to search it. According to Newman, Binford responded "Yes, but you won't find anything but clothing in it."

When Newman asked for consent to search the backpack, he was not yelling or pointing firearms at Binford. Newman said that Binford was not at all confused as to what Newman was asking him for permission to do.

Newman testified that he searched the backpack, in the presence of Binford. He said that he found clothing items, and at the bottom of the backpack, a loaded Hi-Point .9mm handgun. A photo of the gun was admitted as Exhibit 1.

Newman then identified a video recording of the search of the backpack, taken by a camera in a LCPD cruiser. The video was admitted as Exhibit 2. Newman testified that the video shows Binford actually telling the officers several times to go ahead and search the backpack; all they would find would be clothes. The video shows the subject firearm being pulled from the bottom of the backpack.

Newman testified that even if a gun had not been found, Binford would have been arrested.[1] After his arrest, Binford's personal items, including the backpack, would have been taken to the jail. There an inventory search was required by police department policy.

On cross-examination, Newman testified that after he handcuffed Binford, Binford was not a threat to officer safety. Still, Newman asked for permission to search the backpack,

---

[1] The victim came to the park and identified Binford as the person who threatened him with a firearm.

because there was a report of a gun in the possession of Binford, and it had not been located on his person.

The Government's second witness was Martin Ward ("Ward"), an officer with the LCPD. Ward testified that he has been with LCPD for five years and that his job title is patrolman.

Ward testified that on October 8, 2011, he responded to a call of a man threatening another man with a gun at 503 Ferry Street, Loudon. Ward spoke with the victim and got a description of the perpetrator. Ward left 503 Ferry Street when he got a call that Sergeant Newman had located a person matching the description of the suspect in Jiffy Park.
When Ward arrived at Jiffy Park, Binford was handcuffed. Ward testified that Newman asked Binford for consent to search his backpack, and that Binford gave consent, saying something to the effect of "go ahead, there is nothing in it but clothes." Ward testified that clothes were found in the backpack, along with a loaded firearm.

Ward then testified as to the policy of the LCPD regarding inventory searches of arrestee's property. He said that Binford would have been arrested on the threatening charge, even if the weapon had not been found. He said that the backpack would have been searched after Binford was arrested, before it could be allowed into the jail.

I. **Defendant's Objections**

The Defendant makes three discrete arguments in opposition to the R&R: 1) The Defendant was placed in handcuffs and not read his *Miranda* rights; therefore, his consent was coerced and the evidence should be suppressed; 2) The police lacked "probable cause"[2] to handcuff the Defendant; and, 3) Hypothetically, assuming that that the gun had not been discovered, using the police inventory procedures to search the Defendant's backpack would be

---

[2] The Defendant confuses "probable cause" with "reasonable suspicion." The distinction between the two concepts will be discussed later.

an impermissible investigatory tactic under *Florida v. Wells,* 495 U.S. 1 (1990); [Doc. 37 at 2]; [*Id.* at 6]; [*Id.* at 7].

## II. Analysis

### a. Defendant's Consent to Search

The Defendant raises two arguments in favor of coercion. First, the Defendant was placed in handcuffs and handcuffs are coercive; second, the Defendant was not read his *Miranda* rights; therefore, his consent was coerced and the evidence should be suppressed.

### i. *Miranda* Does not Apply to Physical Evidence

The Defendant confuses the protections offered by the Fifth Amendment with those offered by the Fourth Amendment. The Defendant argues that "there is absolutely no proof that the Defendant was administered any *Miranda* warnings prior to being handcuffed or requested to consent." [Doc. 37 at 5]. Defendant's argument that failure to read *Miranda* rights triggers the exclusionary rule is erroneous. As the Supreme Court has made clear, "a mere failure to give *Miranda* warnings does not, by itself, violate a suspect's constitutional rights . . . " *United States v. Patane*, 542 U.S. 630 at 639. For Fourth Amendment violations, evidence that is gathered as a result of coercion or without the requisite level of suspicion will be excluded as the fruit of the poisonous tree. *Wong Sun v. United States*, 371 U.S. 471, 485-86 (1963).

The Supreme Court has never applied the "fruit of the poisonous tree" doctrine as a remedy to cure technical *Miranda* violations. *Miranda* protects the Self-incrimination Clause, which is "not implicated by the introduction at trial of physical evidence resulting from voluntary statements." *Patane*, 542 U.S. at 639. "[The] [i]ntroduction of the nontestimonial fruit of a voluntary statement . . . does not implicate the Self-Incrimination Clause. The

admission of such fruits presents no risk that a defendant's coerced statements (however defined) will be used against him at a criminal trial." *Id.* at 643. Rather, the "exclusion of unwarned statements . . . is a complete and sufficient remedy for any perceived *Miranda* violation." *Id.* In *United States v. Patane*, the Supreme Court held that the failure to administer *Miranda* warnings does not translate into the suppression of the physical fruits of the suspect's unwarned, but *voluntary* statements. *Id.* Even if there were a *Miranda* violation in this case[3], that does not mean that the physical evidence derived from Defendant's unwarned statements should be suppressed. *Id.* Rather, the only way that physical evidence obtained from unwarned statements will be excluded is if the statements were made involuntarily. *Id.*

---

[3] The Defendant raised the argument that there was a *Miranda* violation; however, he did not properly plead the elements of *Miranda* violation suppression. For example, while the Defendant alleges a *Miranda* violation, Defendant does not argue which statements ought to be excluded from evidence. The fact that the Defendant did not properly plead a *Miranda* violation does not prevent the Court from considering the issue on the Defendant's behalf; however, as mentioned above, *Miranda* violations do not exclude physical evidence, only incriminating testimonial evidence. Here, the Defendant did not offer any incriminating testimonial evidence, nor is the Defendant specific about when the alleged *Miranda* violation occurred. Considering the aforementioned facts, and the incomplete pleading, the Court does not see a reason to suppress any of the Defendant's statements *sua sponte*.

### i. Handcuffs are not *per se* Evidence of Coercion

The Defendant argues that since he was handcuffed prior to consenting to a search, his consent was coerced. For Fourth Amendment violations, evidence that is gathered as a result of coercion or without the requisite level of suspicion will be excluded as the fruit of the poisonous tree. *Wong Sun* 371 U.S. 485-86 (1963). To determine whether a statement was made involuntarily, courts look to the "totality of the circumstances concerning whether a defendant's will was overborne in a particular case." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999) (quoting *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994)). The purpose is to determine whether police activity was so coercive that it made the defendant's consent involuntary. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

When evaluating whether the statement was made involuntarily, courts consider "the age of the accused, his level of education and intelligence, his physical condition and emotional state at the time of the confession, his expressed fears of violent reprisals, actual physical punishment, the proximity of the coerciveness of the confession as given, and the inherent coerciveness of the confession as given." *United States v. Wrice*, 954 F.2d 406, 411 (6th Cir. 1992). The court also looks at the "length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food or sleep. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). The court may also consider the defendant's prior criminal record. *Ledbetter*, 35 F.3d at 1070. Defendant's criminal record- and therefore experience with law enforcement officers- makes it more likely that his unwarned statements were made voluntarily.

Turning to the instant case, Defendant was questioned for approximately five minutes; he was not threatened with physical punishment, nor was he deprived of food or sleep. Furthermore,

this is not the first time that Defendant has been interrogated by police officers. Defendant has a significant criminal history, which is why 18 U.S.C. 922(g)(1)—Felon in Possession of a Firearm—is applicable to the Defendant. Having been convicted of serious offenses, Defendant is in a better position to offset any minimal pressure exerted by police officers. Based upon the above-mentioned factors, the Court finds that Defendant was not coerced into compliance with the officer's request based on length or manner of questioning; however, the Defendant raises another argument in support of coercion. Defendant argues that handcuffing the Defendant created a coercive environment wherein the Defendant felt compelled to comply with the officer's request.

In *United States v. Strache*, the issue was whether the defendant voluntarily consented to allowing the police to search his apartment. 202 F.3d 980, 98. The defendant was detained but not advised of his *Miranda* rights. *Id.* The defendant was handcuffed, but the court found his consent to search was made voluntarily. *Id.* Notably, the court held that "custody [being handcuffed] is not dispositive so long as the potentially coercive effect of custody was mitigated by the circumstances." *Id.* While the defendant in *Strache* was handcuffed, the police did not badger him, physically abuse him, or pressure him. *Id.* Likewise, while Defendant in the present case was handcuffed when he gave consent to search his backpack; this Court accepts the Magistrate's finding that he was not badgered or unduly pressured by the police. Despite being handcuffed, the surrounding circumstances demonstrate that Defendant was not physically coerced into making the statements.

Similarly, in *United States v. Sylvester*, the defendant was kept handcuffed in a holding cell for five hours before he was taken to an interrogation room. 2009 WL 1457650 (6th Cir. 2009). Notwithstanding these circumstances, the Court held that the defendant's various

statements both in the interrogation room and outside of it, were made voluntarily—despite being handcuffed and vigorously interrogated. *Id*.

In the present case, the arresting officers testified that they received a call from a man who claimed to have been threatened by a man with a firearm. [Doc. 38-5 at 22-25]. The officers responded to the call by visiting the alleged victim, obtaining a description, and subsequently discovering a man matching the assailant's description; that man was the Defendant. Upon approaching the Defendant, Officer Newman called the Defendant over to his car, and then handcuffed him explaining to the Defendant why he was handcuffing him. This Court accepts the Magistrate's finding that the officer's testimony was credible. Since the alleged offense involved a firearm, the Defendant was then handcuffed for officer safety. From the testimony it appears that the episode took approximately five minutes, and the Defendant was not placed in a holding cell to promote compliance with the officer's request. If the Sixth Circuit found that the conditions in *Sylvester* were not physically coercive, then certainly the Defendant in this case was not physically coerced.

Considering the above-mentioned facts and applicable law, the Defendant's consent was clearly not coerced.

### b. The Officers had Reasonable Suspicion to Detain the Defendant

The Defendant argues that the officers lacked "probable cause" to handcuff the Defendant [Doc. 37 at 6], and the Defendant is correct—probable cause had not yet been established. While at the officers lacked probable cause at time the Defendant was handcuffed, the officers did have did have a "reasonable suspicion" that the Defendant had committed a crime, and "reasonable suspicion" is all the officers needed to detain—and handcuff—the Defendant. While the Defendant uses "probable cause" and "reasonable suspicion" interchangeably, there is a distinction. *United States v. Wilhoite,* 86 F.App'x 945, 949 (6th Cir.

2004). In order to arrest a suspect, the arresting officer(s) must have "probable cause." *Id.* At the time the Defendant was handcuffed, the officers did indeed lack probable cause to arrest the Defendant as the only evidence they had linking the Defendant to the criminal activity was a vague description of his height, race and gender[4]; however, the inquiry into probable clause is irrelevant; the requisite level of knowledge necessary to detain an alleged suspect is "reasonable suspicion" not "probable cause." *Id.*

"Detention," or, the act being detained, requires that the detaining officer have "reasonable suspicion" of criminal conduct. *See Terry v. Ohio,* 392 U.S. 1 (1968)(holding that "reasonable suspicion" that the person detained has committed, is committing or is about to commit a crime, is all that is necessary so long as the suspicion is based on "specific and articulable" facts.). Matching the general description of a criminal suspect does establish reasonable suspicion—or specific and itemized evidence—sufficient to justify a brief detention. *Id.*

According to the testimony of Officer Newman [Doc. 38-9, ¶ 9-16.], Mr. Binford only approximately matched the description given to him by the victim. Officer Newman was told that the assailant had a white shite and khaki pants, whereas the defendant was wearing grey jogging pants when the officer chose to call him over. *Id.* Nevertheless, the officers were able to combine several other factual elements that, when considered on the whole, created a reasonable suspicion that the Defendant was the alleged assailant. First, the Defendant identified himself as "Quinton" to Officer Newman, and Officer Newman knew that the man that threatened the victim went by the nickname "Q." As mentioned above, even though the Defendant was not

---

[4] One could argue that the relative uniqueness of the Defendant's backpack, in conjunction with his proximity to the scene of the crime, established probable cause to arrest. Indeed, the officers allege that they would have arrested the Defendant regardless of whether they had found a gun in his backpack. However, though the officers may have, in fact, arrested the Defendant, does not mean that the arrest would have been lawful. Certainly, after the officers brought the victim to identify the Defendant as his attacker, the officers had probable cause to arrest.
Whether—absent the identification provided by the victim—the uniqueness of the backpack and proximity to the scene of the crime created sufficient cause to arrest the Defendant need not be considered by this Court since the victim did identify the Defendant and a gun was discovered in his backpack.

wearing the same clothes, the clothes were similar enough to be considered corroborating factors. Furthermore, after securing the Defendant, the Officers brought the victim to the park to identify Mr. Binford [Doc. 38-23, ¶ 14-21.] After positive identification, the Police had probable cause to arrest Mr. Binford—even without finding the firearm in the Defendant's backpack.[5] Before the Defendant was identified by the victim, the officers had a reasonable suspicion that the defendant had committed a crime and that he was likely in possession of a firearm. Since the officers had a reasonable suspicion of criminal activity involving a firearm, the officers were within their rights to take precautionary measures to secure the Defendant, through handcuffs, until the officers could be reasonably sure that the situation would not escalate.

    c. **Inventory Searches**

The Defendant's last argument is hypothetical. The Defendant argues that, assuming the gun had not been discovered, using the police inventory procedures to search the Defendant's backpack would be an impermissible investigatory tactic under *Florida v. Wells,* 495 U.S. 1 (1990). The Defendant's argument is unclear. There are three relevant inquiries in the instant case: 1) Did the officers lawfully detain the Defendant; 2) Did the Defendant give consent to search his backpack free from coercion; and 3) Did the officers, after finding the firearm, have probable cause to arrest the Defendant? If the answer to the first two is yes, then the third must also be answered in the affirmative. Since the officers did lawfully detain the Defendant and the Defendant did freely give the officers his consent to search, the inventory procedures of the police department is irrelevant.

The Court recognizes that the Magistrate, the Defendant and the Government are addressing the doctrine of inevitable discovery without speaking its name; however, the doctrine need not be applied if the detention and consent were lawful. Since its application it not applicable here, the Court will not address the doctrine of inevitable discovery.

---

[5] The officers certainly had probable cause after finding the firearm.

## II. Conclusion

The Court finds that the officers held reasonable suspicion of criminal activity sufficient to detain and handcuff the Defendant. The Court further finds that the Defendant, when prompted, consented to a search of his backpack. Since the Defendant was lawfully detained and freely consented to a search, application of the exclusionary rule would be unnecessary.

Accordingly, Judge Guyton's R&R [Doc.36 ] is **ACCEPTED IN ITS ENTIRETY**. Defendant's Objections to the R&R [Doc. 37] are **OVERRULED**, whereby Defendant's Motion to Suppress Physical Evidence [Doc. 25] is **DENIED.**

**ENTER:**

s/ Thomas W. Phillips

United States District Judge